**Curtis Lee WATSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 13796, 13815, 83–996, 83–1136 and 83–1150.**

District of Columbia Court of Appeals.

Argued Nov. 6, 1986.
Decided Dec. 10, 1987.[*]

James Klein, Public Defender Service, with whom Elizabeth G. Taylor and David Reiser, Public Defender Service, were on the brief, for appellant.

Michael W. Farrell, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Judith Hetherton and Thomas J. Tourish, Jr., Asst. U.S. Attys., were on the brief, for appellee.

* This opinion was released in typed form prior to printing.

Before PRYOR, Chief Judge, MACK, NEWMAN, FERREN, BELSON, ROGERS, and STEADMAN, Associate Judges, GALLAGHER, Senior Judge, and NEBEKER,** Associate Judge, Retired.

GALLAGHER, Senior Judge:

This case is before us *en banc* on a claim by appellant of ineffective assistance of counsel on his previous direct appeal from his conviction. It was heard previously before a division of this court, (*Watson v. United States*, 508 A.2d 75 (D.C.), *reh'g granted, judgment vacated*, 514 A.2d 800 (D.C.1986)), and when the court decided to hear the case *en banc*, the opinion of the hearing division was automatically vacated in accordance with our usual procedures.[1] Also involved are appeals from trial court orders dealing with issues of ineffectiveness of trial counsel and denying collateral relief from prior judgments of conviction.

## I

In this appeal, appellant preserves all the issues he previously raised before the hearing division of this court on the appeal based upon ineffective assistance of counsel.[2] But appellant's focus is now explicitly on the issue of misjoinder of offenses (the "consolidation issue") as it relates to the claim of "ineffectiveness of counsel" on appeal. Consequently, the thrust of this opinion will be on the "misjoinder" question

** Judge Nebeker was an Associate Judge of this court at the time of argument. His status changed to Associate Judge, Retired, on September 1, 1987.

1. *See* D.C.App.R. 40 and District of Columbia Court of Appeals Internal Operating Procedure XI.

2. In addition to the ineffectiveness of the appellate counsel claim, counsel's two other issues raised before the original division were preserved before the court *en banc*, though not argued. *See Watson v. United States*, 508 A.2d 75 (D.C.1986), *reh'g granted, judgment vacated*, 514 A.2d 800 (D.C.1986). We incorporate by reference the analysis and disposition of those issues in the original division opinion, and we adopt those holdings, namely: (1) appellate counsel's failure to raise the sufficiency of the evidence issue on the first-degree murder conviction in the initial direct appeal precludes review on a second appeal, *Watson v. United*

as it relates to the claim of ineffective assistance of appellate counsel in presenting the misjoinder issue on his direct appeal from his conviction. Procedurally, the ineffectiveness of appellate counsel issue is raised before us by a motion to recall our mandate in this case.

In a case involving a claim of ineffective assistance of counsel on appeal, there are two principal manifestations of appellate representation: (a) the brief and (b) oral argument. The brief and oral argument are illuminated by the record in the case, including the court's opinion. Due to the passage of time, however, we have no access to the tape of oral argument on direct appeal, which took place some seven years ago, because the tape has been routinely erased.[3] We therefore are confined primarily to appellant's brief on the direct appeal, and the record (including our opinion) for our present review on the ineffective assistance of counsel issue.

It is important to realize at the outset exactly what the claim, as now refined, is in this case. Appellant contends that he was denied the effective assistance of counsel on his direct appeal from his conviction because his retained appellate counsel[4] *failed to present adequately* on appeal a prejudicial consolidation of offenses at his trial (misjoinder of offenses). It should be recognized that appellant does not contend his first appellate counsel failed to raise

*States*, 508 A.2d 75, 87–88 (D.C.1986); and (2) ineffectiveness of *trial* counsel, *id.* at 88–91 (trial counsel was not ineffective).

3. This factor is an unfortunate circumstance in the consideration of this particular issue. It prevents a total overview of counsel's performance. For example, we do not know the nature of colloquies, if any, that may have taken place during oral argument in relation to the "joinder" issue. Consequently, the result is we have here a somewhat undesirable vehicle for exploration of the appellate ineffectiveness claim. But we must decide the issue, nevertheless.

4. The right applies to both appointed and retained counsel. *Evitts v. Lucey*, 469 U.S. 387, 395, 105 S.Ct. 830, 835, 83 L.Ed.2d 821 (1985). Consequently, we have no equal protection issue in this case.

the misjoinder issue. Rather, he claims he did not raise the misjoinder issue "adequately." Relatively speaking, this is something of an intellectual refinement of the usual theme in "ineffectiveness" cases, as the charged blunder is usually much more flagrant. *See, e.g., Hollis v. United States,* 687 F.2d 257 (8th Cir.1982) (counsel's failure to file appeal); *Mylar v. Alabama,* 671 F.2d 1299 (11th Cir.1982) (counsel's failure to file brief with appeal); *Passmore v. Estelle,* 607 F.2d 662 (5th Cir.1979) (counsel's submission of one-sentence appellate brief on behalf of one whose conviction had resulted in a life sentence); *Meyer v. Florida,* 415 So.2d 70 (Fla.Dist.Ct.App. 1982) (counsel's failure to file timely notice of appeal).

Appellant related to the court at the outset of oral argument in measured terms precisely what he contends is this court's task in this case. He said:

> Watson's claim, in essence, is that he was denied his constitutionally guaranteed champion on appeal. *To prevail, we must convince the court that it should lack confidence in its own opinion.* An opinion that I fully recognize was authored by a division of two of the judges here today. *That is an extraordinarily high standard.* But in fact, we would submit that Watson has done more. With remarkably little opposition from the government, *Watson has made what we think is a convincing claim that the opinion which came out in November of 1979 was wrong, through no fault of the court;* something which will not happen very often, for I'm sure this court has confidence in the integrity in its own opinions, as we do. *It was wrong we submit,* and let me just be crystal clear, that *unless we prevail on this claim, we are out of court on our claim of ineffective assistance of appellate counsel. But that opinion was wrong,* we submit, because the court was misinformed. It believed, when it tried to determine whether Watson's trial was fair, which was its sworn duty, *that the argument for consolidation, as the court called it,*
>
> *was strong enough to find the trial fair.*

(Emphasis added.)

In other words, appellant is putting it up to this court (a) to reexamine its previous opinion on the direct appeal, and (b) to decide that its prior decision was wrong "through no fault of the court" but, rather, due to appellate counsel's inadequacy in the consolidation (misjoinder) contention, and hence, (c) counsel was constitutionally "ineffective."

We, of course, intend to address our concept of the law on ineffective assistance of counsel on appeal, as that is the issue in this case. But, so there will be no mistake about it, we wish to make it quite plain at the outset that we do not intend to accept appellant's invitation to focus primarily on our division's opinion. If we were to wander into that precedential quicksand, we would be signalling that unsuccessful criminal appellants can obtain a second appeal on the merits, if they base it on the ground that the court's opinion on the first appeal was wrong.[5] The argument is that it would not have been wrong but for the ineffective assistance of counsel on the first appeal for inadequately raising an important issue. While we will not take this precarious approach to the issue, we will nevertheless keep the avenue always open for a claim of ineffective assistance of counsel by the use of proper standards.

We are going to examine the presentation to the court by appellant's first counsel, as distinguished from placing the primary focus on our division's prior opinion. We are not going to look at his performance in order to determine whether his presentation left something to be desired, or whether counsel put the court to an unnecessary degree of work in its review. We will determine whether counsel's performance deprived appellant of his substantive due process right to counsel stemming from application of the Sixth Amendment. Our decision is not simply based on whether counsel can be faulted on some scores. Ours is a constitutional review, not a grading exercise. *See Strickland v. Washing-*

---

**5.** It is not a rare thing for an unsuccessful litigant to think the court was wrong.

*ton,* 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984).

One final thought while laying the groundwork for our discussion: appellant must realize that when a claim of ineffectiveness of appellate counsel is raised in this court, an appellant is arguing in territory at the outermost limits of the constitutional guarantee to the right to counsel.[6] There is no doubt about the well-known and oft repeated historical truism on the crucial importance of counsel to a criminal defendant (or any litigant) every step of the way. *Johnson v. Zerbst,* 304 U.S. 458, 462–63, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938); *Powell v. Alabama,* 287 U.S. 45, 68–71, 53 S.Ct. 55, 63–65, 77 L.Ed. 158 (1932); *see McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970); *Grosjean v. American Press Co.,* 297 U.S. 233, 243–44, 56 S.Ct. 444, 446, 80 L.Ed. 660 (1936). Of this there can be no doubt; and incidentally, the abler counsel's performance, the lighter the burden for the decision-maker.[7] These are realities which are indisputable and have long been widely accepted by bench and bar, so we need not elaborate on them further. Well-litigated cases by able and prepared counsel are something the bar should continually strive toward, with judicial encouragement and assistance.

We have observed that the issue here is at the outermost constitutional limits because the reality is that (a) appellant has previously received a judgment of conviction, and (b) has already received an appellate review which affirmed the conviction. Consequently, an appellant has "no easy row to hoe" in the constitutional attack. The court must be particularly circumspect in our review or else we will inadvertently encourage a routine of unwarranted second appeals by unsuccessful appellants in criminal cases. At the same time, we certainly do not intend to discourage a genuine claim on ineffective assistance of appellate counsel.

## II

Recognizing that *Evitts v. Lucey, supra* note 4, establishes a due process right to effective assistance of counsel, whether retained or appointed, on a "first appeal" as of right, appellant contends that we should either remand for resentencing or reopen his appeal.[8] This would necessarily require that we first recall the mandate affirming his convictions.

Before reaching the merits of appellant's due process claim, we must dispose of the procedural matter of how one may challenge previous counsel's effectiveness on appeal. The approach taken by appellant, filing with this court a motion to recall the mandate, is a proper one. D.C.App.R. 41(c), which became effective on January 1, 1985, provides:

> RECALL OF MANDATE: In any appeal from a judgment of conviction in a criminal case, no motion to recall a mandate based on the asserted failure of counsel to represent the appellant effectively on appeal shall be considered by the court unless the motion is filed within 180 days from the issuance of the mandate.

Appellant's motion to recall the mandate was filed before Rule 41(c) became effective. He was not required, therefore, to comply with the 180–day provision of our rule.[9]

Rule 41(c) does not by its terms affirmatively require the filing of a motion to recall the mandate as the means of presenting a *Lucey*-type challenge of ineffectiveness on a direct appeal. However, no more suitable method of raising such a claim is available procedurally.

---

**6.** We say "outermost limits" because we do not suppose that this claim, as a matter of reality, would get very far if raised in relation to an appellate counsel who represented a criminal defendant before the Supreme Court of the United States, this being the Court which is beyond this court in appellate review.

**7.** The reverse is naturally true.

**8.** Remanding the case for resentencing would afford appellant the opportunity for another direct appeal. *See Hines v. United States,* 237 A.2d 827, 828 (D.C.1968).

**9.** We note that prior to our promulgation of Rule 41(c) there was no rule of this court which addressed a motion to recall a mandate.

To be sure, there are procedures which are *not* available. In *Streater v. United States*, 429 A.2d 173 (D.C.1980) (per curiam), *appeal dismissed and cert. denied*, 451 U.S. 902, 101 S.Ct. 1966, 68 L.Ed.2d 289 (1981), we stated that D.C.Code § 23–110 (1981), a popular means of collaterally attacking a conviction, "provides no basis upon which the trial court may review appellate proceedings." *Id.* at 174. This construction is supported by decisions on the analogous federal statute, 28 U.S.C. § 2255 (1982) (cited in *Streater, supra*, 429 A.2d at 174), as well as by reason: the Superior Court should not have authority to rule on the constitutionality of an appellate proceeding.[10] *Streater* is particularly instructive in this case because of the identity of issues: ineffectiveness of appellate counsel.

For much the same reason, D.C.Code § 16–1901 (1981), which provides for habeas corpus relief, does not vest in Superior Court the power to entertain complaints about the adequacy of appellate counsel. Upon application, the court may grant a habeas corpus writ "if the facts set forth in the petition make a prima facie case" that a person is unlawfully confined. *Id.* § 16–1901 (a). In the context of this case, where a denial of due process would form the basis of a petition, such a determination would necessarily require the lower court to pass judgment on the efficacy of the appellate review. *See Streater v. Jackson*, 223 U.S.App.D.C. 393, 395, 691 F.2d 1026, 1028 (1982) (per curiam).[11]

A motion in this court to recall the mandate is the appropriate avenue to take in presenting a *Lucey* challenge. *See United States v. Winterhalder*, 724 F.2d 109, 111 (10th Cir.1983). This is not to say that this court will entertain on the merits a claim of ineffective appellate counsel by first recalling the mandate. This would be a precipitous practice and run contrary to the accepted rule that mandates may be recalled only in the presence of exceptional circumstances. *See Greater Boston Television Corp. v. FCC*, 149 U.S.App.D.C. 322, 332, 463 F.2d 268, 278 (1971) (rule is based on "the strong policy of repose, that there be an end to litigation," citing *Hines v. Royal Indemnity Co.*, 253 F.2d 111, 114 (6th Cir. 1958)). Rather, this court will examine motions of this nature and, if they have on their face sufficient merit *in accordance with this decision*, will recall the mandate and reopen the appeal.[12] That way judgments will not be disturbed unless the movants carry their heavy initial burden. *See generally Streater v. United States*, 478 A.2d 1055, 1057 n. 3 (D.C.1984); *Dilley v. Alexander*, 200 U.S.App.D.C. 354, 357, 627 F.2d 407, 410 (1980). By this we mean the initial burden the movant must satisfy is to set forth in detail a persuasive case for recall of the mandate. To put it another way, conclusory assertions are not sufficient. The movant must give "chapter and verse." As a matter of degree, this court will be looking more for factual support than argument. The constitutional argument on "ineffectiveness" is likely to be quite familiar to the court.

Our decision in *Streater v. United States, supra*, 478 A.2d 1055, suggests that this is an acceptable procedure. That

---

**10.** It is appropriate at this point to distinguish *Little v. United States*, 438 A.2d 1264 (D.C.1981), *Samuels v. United States*, 435 A.2d 392 (D.C. 1981), and *Hines v. United States, supra*, 237 A.2d 827. In these cases, the defendants, for one reason or another, had failed to timely file a notice of appeal from their convictions. In *Little* and *Samuels*, we remanded the case to the trial court for a hearing pursuant to § 23–110 on claims of ineffective assistance of counsel, *i.e.*, in bringing the direct appeal. In *Hines*, we found ineffective assistance of counsel and remanded for resentencing. Unlike the case now before us, there had been no appellate review on the merits in *Little, Samuels*, or *Hines*. These cases, therefore, while still viable, are

inapposite here. *See Schwander v. Blackburn*, 750 F.2d 494, 501 (5th Cir.1985).

**11.** It does not appear that a defendant, in the first instance, could seek review of counsel's performance on appeal to this court by filing a writ of habeas corpus in the federal district court. *See, e.g., Streater v. Jackson, supra*, discussed *infra* pp. 1060–1061; *cf. Swain v. Pressley*, 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977) (construing D.C.Code § 23–110(g)).

**12.** This remedy is more expedient administratively than remanding the case to the trial court for resentencing, one approach suggested by appellant. *See supra* note 11.

case derived from our decision in the earlier *Streater v. United States, supra,* 429 A.2d 173, in which we held that Streater's claim that he had been denied the effective assistance of appellate counsel was not cognizable in Superior Court under § 23-110.[13] 429 A.2d at 174. Following this rule, Streater petitioned for a writ of habeas corpus in the federal district court for this jurisdiction. The federal district court dismissed the petition, however, on the ground that Streater could seek relief in Superior Court under D.C.Code § 16-1901 and therefore had not exhausted his non-federal remedies. On appeal, the federal circuit court, in *Streater v. Jackson, supra,* vacated the judgment of the district court. It agreed with Streater's argument that our earlier decision foreclosed any remedy in Superior Court "on the ground that a trial court is not positioned to review proceedings in a court of appeals." 223 U.S.App.D.C. at 395, 691 F.2d at 1028.

Persuaded that this court would be best suited to resolve Streater's ineffective assistance of appellate counsel claim, the federal circuit court remanded the case to the district court with instructions that it hold Streater's habeas corpus petition in abeyance pending his application to this court to recall the mandate and reopen the direct appeal. *Id.* at 395, 691 F.2d at 1028. Accordingly, Streater then filed a motion in this court to recall the mandate. *Streater v. United States, supra,* 478 A.2d at 1057 n. 3. A motions panel granted the request, vacated our original judgment, and thereby revitalized Streater's direct appeal. *Id.* at 1057.

This court will pursue a claim of ineffective assistance of appellate counsel which initially has been found by the court to *have sufficient merit* by recalling the mandate and reopening the movant's appeal in order to fully explore and then decide whether there was ineffective assistance of counsel on the first appeal.

One final procedural matter should be addressed. It is conceivable that a *Lucey* claim will be premised on an argument which requires the resolution of some material factual issue. Suppose a defendant filed a motion to recall the mandate affirming his conviction which challenged the adequacy of his appellate counsel on a newly discovered ground where a factual issue was crucial to the appellate issue. The government responds in opposition to the motion that no such occurrence took place, as a matter of fact. Plainly, before this court could rule on the motion to recall the mandate, and assuming the issue presented appears to be of sufficient gravity to warrant exploration, factual findings would be necessary to determine whether the circumstance actually existed and, if so, what exactly took place. Thus, in some cases, the record may be remanded to the trial court under appropriate instructions and time constraints for a hearing and factual findings, with this court retaining jurisdiction pending the trial court's findings and a return of the record.

### III

We proceed now to determine whether retained counsel for appellant on his first appeal from his conviction was ineffective, as a matter of constitutional law. The way we proceed to a conclusion on this issue is, essentially, to examine counsel's performance on the appeal. The focal point is counsel, not this court.

It is immediately apparent that counsel reviewed the trial record in this case. Of that there can be no genuine question. Looking at the comprehensive statement of facts in the brief, it is evident that the testimony of all the witnesses was examined and summarized. We note there are no fewer than 101 transcript references in the course of the factual review of the record. Clearly, there is not a question of unfamiliarity with the trial record on the

---

**13.** Streater claimed that his appellate counsel was ineffective because he filed a motion with this court to withdraw from the appeal certifying that there were no nonfrivolous issues. *See*

*Gale v. United States,* 429 A.2d 177 (D.C.1981); *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). We granted the motion and affirmed his convictions.

part of the first appellate counsel.[14] So we can set that potential pitfall aside.

He filed a twenty-four page brief. He raised three issues: (a) appellant was prejudiced by the conduct of the trial judge toward his counsel throughout the trial; (b) the trial court erred in failing to deny the government's pretrial motion to consolidate the three offenses; and (c) the trial court erred in failing to grant appellant's motion for judgment of acquittal on the charge of first degree murder.[15]

Counsel made a nine-page Statement of the Case (with the aforementioned 101 transcript references). This contained a statement of the procedural history and a comprehensive statement of the evidence at the trial. These were properly referenced to the record.

He provided a Table of Cases containing thirteen case citations. In doing so, he drew the court's attention to four of those cases as being "chiefly relied on." Three of the four are leading cases in this jurisdiction on what has now become the issue principally relied upon, i.e., the "consolidation" (severance) issue. He then provided other references, e.g., the trial court rules on joinder (Rules 8 and 14), and a legal text reference relating to "joinder."

The brief then outlines the three issues being raised. The remainder of the brief (some sixteen pages) is devoted to argument on the three issues raised on the appeal. While we need not concern ourselves extensively with two of these three contentions,[16] it is apparent that the first issue raised relating to the trial judge's conduct in the trial was not frivolous and was extensively briefed, with appropriate application of leading cases in this jurisdiction on the point. Skipping the second issue (on joinder) for a moment, the third issue raised related to the sufficiency of the evidence. This was a substantial appellate issue in this case, though counsel's method of presenting only one facet of it was not the most effective way of presenting the issue. To summarize, appellant briefed three issues of substance on the appeal, including the one which at this late date has finally been selected by appellant for attack on this particular appeal.

We turn now to the portion of the brief devoted to the "consolidation" question, the crucial issue.[17] We note there are three pages in the brief devoted to this misjoinder issue, during which there are cited in various segments of the discussion, four leading opinions of this court on "severance" and one landmark opinion on this question by the United States Court of Appeals for this jurisdiction, as well as a leading textwriter; and the brief draws into discussion the pertinent rules of criminal procedure of the Superior Court on "joinder" (Rules 8 and 14).

After pointing out, initially, that the joinder of counts in an indictment against a single defendant is "a particularly thorny" issue, which is covered by the trial court's Rules 8 and 14, and outlining the three crimes which were here consolidated for trial, the brief proceeds to a discussion of the law on "joinder" in this jurisdiction.

**14.** We are not stating by implication that because we have here a concededly able and experienced retained counsel who has reviewed the trial record, that these factors, by themselves, establish in the government's favor the ineffective assistance of counsel issue. The way appellant put it to this court is:

> [E]ight years ago [appellant's counsel] came to the Public Defender Service and taught the training class—the new class on the jury box and he gave us a performance, showing us how to do cross-examination because he is, as many of you judges know, one of the experts in the trial court. And after the performance he gave us a lecture that everyone in that class remembers. He told us as we were starting out, before we got our first appointment, that

> we, as defense counsels, were sentinels of freedom, and I don't think [counsel for appellant] would mind for one moment that the Public Defender Service was on the watch.

**15.** On this pending appeal, however, the constitutional attack is now narrowed essentially to first counsel's treatment of the "consolidation" issue.

**16.** This is because they are now outside the focus of appellant's contentions on this appeal.

**17.** We do, however, consider the total performance of counsel on appeal in assessing his performance in this case, insofar as we are able to do so, lacking a transcript of oral argument.

The thrust of counsel's argument was that the indictments were not joinable under Rule 8(a) of the trial court's rules and, alternatively, even if joinder was proper, the consolidation was so prejudicial that severance under Rule 14 should later have been granted. His initial paragraph correctly sets up Rules 8 and 14 as the controlling authority. Though the paragraph is rather succinct and not an exhaustive discussion, the brief clearly and accurately states what the applicable law is:

> Rule 8 permits the joining of different offenses in the same indictment if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. And Rule 14 provides for severance if substantial prejudice would otherwise result.

The next paragraph correctly summarizes the three incidents involving Watson which were consolidated for trial: (1) the May 30, 1976, assault that took place within the house at 1926 Quincy Street; (2) the June 5, 1976, breaking into *the same house* and assault with intent to kill there; and (3) the June 28, 1977, murder *at the same house.*

Counsel then submits that the only theory which would allow a joinder of these offenses under Rule 8 is that the three were of the same or similar character. He sets forth the focus of the remainder of the argument—the prejudice that resulted from joinder. Counsel then refers this court to its own leading decision on joinder in *Bridges v. United States,* 381 A.2d 1073 (D.C.1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978). *Bridges* is quoted to illustrate the risk of prejudice to be guarded against when joining offenses for trial: (1) that the jury might cumulate the evidence; and (2) that proof of one offense may be used by the jury to convict defendant of another offense where the evidence is otherwise insufficient.

Counsel did not specifically relate to the division what this court said in *Bridges.* But he did refer this court to its own decision in that rape case. There we held that when joinder of offenses is based on the fact that the crimes are of a "similar character," a motion to sever should be granted unless, "(1) the evidence as to each offense is *separate and distinct,* and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others." 381 A.2d at 1075 (emphasis added).

The prejudice discussion in counsel's brief then continues with references to a significant footnote in this court's opinion in *Bell v. United States,* 332 A.2d 351, 353 n. 3 (D.C.1975), distinguishing criminal propensity prejudice, which was analyzed in terms of mutual admissibility of evidence in separate trials, from prejudice arising from the accumulation of evidence, which is analyzed from the standpoint of whether the evidence of each offense is kept "simple and distinct." [18]

The brief then states that the primary thrust of the prejudice argument concerns criminal propensity prejudice. Our decision in *Bridges, supra,* and our decision in *Tinsley v. United States,* 368 A.2d 531 (D.C.1976), are cited here by appellant, and he relates the proposition that the prosecution may not introduce evidence of other criminal acts to show general bad character or the tendency to commit the offense charged. *Bridges* and McCORMICK ON EVIDENCE are utilized by counsel for the rule that, in order to admit evidence of other crimes, it must be introduced for some purpose other than to show the probability that the accused committed the crime charged because he possesses a criminal character.[19]

---

**18.** Appellant here contends, with merit, that counsel should have expanded on the "simple and distinct" doctrine in his brief, and should have argued the non-applicability here.

**19.** In our opinion in *Tinsley,* cited in support by appellant, convictions for two separate counts of manslaughter were reversed because the evidence of each could not be said to have been kept "separate and distinct" at trial. The court engaged in a detailed exposition of the facts and

Counsel did not, as hindsight might suggest he should have, repeat to this court what we had stated in *Tinsley* —that a reviewing court must look to the record to evaluate the manner in which the prosecutor presented evidence of separate crimes in order to assess the validity of appellant's claim that the government failed to keep the offenses "separate and distinct." We said, further, that *unless the two crimes are found to be mutually admissible,* "the points of potential similarity cut the other way. Every suggestion at trial that the two crimes [are] in some way similar increase[s] the likelihood that the jury [will become] confused or misuse[ ] the evidence." *Tinsley, supra,* 368 A.2d at 536–37. This familiar factor, as related by this court in its own opinion in *Tinsley,* should have been elaborated upon in appellant's brief.

We might point out also that in the leading case in this jurisdiction on "joinder," *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), which counsel cites, the United States Court of Appeals for the District of Columbia Circuit put forth a series of rules and considerations for assessing whether the joinder of offenses or defendants in a single trial was so highly prejudicial to the appellant as to outweigh any administratively economic or expeditious value, and therefore require reversal on appeal.

The brief then poses the question: What purpose was there to allow evidence of the 1976 assaults into a trial for the 1977 murder? The remainder of the brief is devoted to the contention that there was no allowable purpose, as none of the five *Drew* exceptions were met. *See Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90.

Counsel appropriately listed the five *Drew* exceptions where evidence of other crimes is admissible when relevant to motive, intent, absence of mistake, common plan or scheme, and identity, and asserted that only motive or identity could reasonably be argued as applicable to this case.

The brief disposes of the potential for the "prior incidents" to fall into the identity category, contending they are not "signature crimes." Our opinion in *Arnold v. United States,* 358 A.2d 335 (D.C.1976) (en banc) is cited for the rule that to be considered "signature crimes," the incidents must be so strikingly similar that proof that a person who committed one offense would be admissible at a separate trial of the other offense to show the person's trademark.

He argues that the facts of Watson's case do not fit the "identity" category because, although the three offenses occurred in the same house, they differed dramatically in severity. The brief continues: "To threaten a person with a gun does not identify the perpetrator as the same man who shot two other people and, a year later, killed a third person even if all incidents did occur in the same premises, especially in light of the fact the decedent was repeatedly stabbed as well as shot. The 'striking' similarity needed to overcome the inevitable and substantial prejudice is absent."

His brief attempts to dispose of the possibility of the incidents falling into the "motive" category. Specifically, counsel wrote: "The incidents of May and June 1976, were in no way connected with appellant's desire to have Timothy Reeves, the decedent, vacate the house. They occurred a little over

---

the manner in which they were presented by the government, with particular attention to the prosecutor's characterization and presentation of testimony and other evidence. *Tinsley, supra,* 368 A.2d at 534–37. The court concluded:

> The essence of the "simple and distinct" test is that the evidence be such that the jury is unlikely to be confused by it or misuse it. Such potential misuse is apparent in [Tinsley's] case where the danger that the jury cumulated the evidence to find guilt under both charges was great. Proof of one charge cannot be made to carry the other.

*Id.* at 537.

It would have saved this court some time and effort if the brief had reviewed the rationale of our opinion in *Tinsley* and had related to the court in what manner the "simple and distinct" test helped his case. Counsel should not have left it to this court to perform this task, though this is by no means a rare experience for the court. If it were the purpose of this review to conduct a "grading exercise" this would detract from the grade. *See supra* discussion at pp. 1057–1058.

one year apart. They tend to establish neither why appellant would kill him nor why appellant would want him out of the house. Timothy Reeves was not even in the picture when those incidents took place." The brief continues that evidence of the assaults "suggests very strongly that, when appellant wants someone out of the house, he is not afraid to use force or the threat of force to get him out." This, he asserts is *"precisely the type of prejudice* discussed in *Bridges,"*—criminal propensity prejudice. The government, says counsel's brief, "used the two assaults to show [Watson's] general bad character and tendency to commit the particular offense charged." (Emphasis added.)

The final paragraph summarizes appellant's position: the offenses were not properly joined because evidence of the assaults would not have been admissible in a separate murder trial. He continues that the assaults would not have been admissible because they do not meet any of the five *Drew* exceptions. Rather, he says, what they do show is "precisely the inevitable prejudice to be guarded against, that is, evidence of bad character and to commit a crime." [20]

The main argument of appellant's brief—that the trial court erred in granting the government's Rule 13 motion as the assaults do not go to identity, motive, common plan or scheme, accident or mistake, or intent in the murder charge—was successful. Appellant convinced the hearing division that the evidence was not mutually admissible.

In his brief, counsel for appellant distinctly made the argument that (a) there was an important *Drew* (joinder) problem in the case; (b) he invoked this court's leading decisions on the issue; and (c) he made a successful frontal attack on *the trial court's crucial ruling* that evidence on the three crimes was mutually admissible. The division concluded, however, that the conviction survived because it was supported by the "simple and distinct" exception.

## IV

The cornerstone case on ineffective assistance of counsel is *Strickland v. Washington, supra,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There, the Supreme Court established a two-prong test for evaluating the claim. Appellant (or defendant) must establish that the attorney's performance "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. Secondly, the required showing of prejudice must be made, *i.e.,* it must be established that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. The appropriate standard is regarded as reasonably effective assistance under prevailing professional norms. To put it another way, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. at 2065. Perhaps a more meaningful way of stating the test is: "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied upon as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. Unless it is apparent initially, however, that the required showing of prejudice can be made there is no point in proceeding to review the record for the purpose of assessing, constitutionally, the performance of counsel. *Id.* at 697, 104 S.Ct. at 2069.

In *Strickland v. Washington, supra,* the Court commented that although it had discussed counsel's performance prior to consideration of the prejudice prong, there is no compelling reason to approach the inquiry in the same order or address both components if an insufficient showing is made on one component. 466 U.S. at 697, 104 S.Ct. at 2069. Where, said the Court, "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

---

**20.** Counsel made no transcript references in these three pages. It would have been helpful to the court to cite to the record where appro-

priate in making these arguments. *See* D.C. App.R. 30.

prejudice, which we expect will often be so, that course should be followed." *Id.* We believe it worthwhile in this particular case, however, to discuss both components of the issue, this being an *en banc* decision at an early stage of decision-making in this court on an "ineffectiveness of appellate counsel" issue.

We might observe that there have been some Supreme Court decisions subsequent to *Strickland; see, e.g., Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); but none of those cases sheds much more light on the basic equations of this particular issue. None of those cases resembles the factual situation creating the "ineffective assistance" issue in this case. Those decisions involved federal habeas corpus proceedings where ineffectiveness of counsel is claimed, but the issue had not been raised previously in the state forum. But here, the claim of ineffective assistance of counsel is markedly different. In *Smith v. Murray, supra,* the Court held that "appellate default" in a federal habeas corpus proceeding may not be based on appellate counsel's "deliberate, tactical decision not to pursue a particular claim," because such tactics are "the very antithesis of the kind of circumstances that would warrant excusing a defendant's failure to adhere to a state's legitimate rules for the fair and orderly disposition of its criminal cases." *Smith v. Murray, supra,* 477 U.S. at ——, 106 S.Ct. at 2666. The Court stated that the decision not to press a certain claim on appeal was not an error of such magnitude that it rendered counsel's performance constitutionally deficient under the test of *Strickland. Id.* at ——, 106 S.Ct. at 2666.

In *Murray v. Carrier, supra,* the Court again dealt with a federal habeas petitioner's burden of showing "cause and prejudice" in a case of procedural default based on Virginia Supreme Court rules. The Court held that "[S]o long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington, supra,* we discern no inequity in requiring him to bear the risk of attor-

ney error that results in a procedural default." 477 U.S. at ——, 106 S.Ct. at 2645–46. These cases, therefore, do not offer much help on the ineffectiveness claim we face here.

## A. *Ineffectiveness*

■ We turn now to a discussion on the merits of the ineffectiveness issue. In his brief, counsel for appellant on the first appeal distinctly made these arguments: (a) there was an important *Drew* (joinder) problem in the case; (b) he invoked this court's leading decisions on the issue; and (c) he made a successful frontal attack on *the trial court's crucial ruling* that evidence on the three crimes was mutually admissible. This was sound appellate advocacy. The evidence was strong to establish "signature crimes." The trial court had permitted joinder on the concomitant "mutually admissible" basis. Consequently, this is precisely where counsel should have attacked in his brief, and he did so successfully. While present appellate counsel is now charging a constitutional failure on prior counsel's part to argue further and demonstrate the non-applicability of the "separate and distinct" doctrine, this may well be attributed to present appellate counsel's hindsight after being able to read this court's Memorandum Opinion and Judgment, rather than a deficiency on the part of the first appellate counsel rising to the level of constitutional inadequacy. As the Supreme Court has cautioned:

> It is all too tempting for a defendant to second guess counsel's assistance after conviction or [an] adverse [decision] and it is all too easy for a court, examining counsel's [performance] after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Strickland v. Washington, supra,* 466 U.S. at 689, 104 S.Ct. at 2065.

The government in its first appellate brief had argued, alternatively, that consolidation was proper because the charges were presented to the jury in a "separate and distinct" manner, thereby foreclosing any undue prejudice during the trial. Ap-

pellant did not address this *Drew* exception ("separate and distinct") in his main brief, and did not file a reply brief. Thus, appellant argues now that his prior counsel "never rebutted the government's argument" on this point and never drew this court's attention to the portions of the record which would rebut the "separate and distinct theory" (this was the government's alternative position in its brief).

This is the way appellant, in a crucial statement made during oral argument defining his position, puts it now to this court:

> We recognize that the court is not passive ... but we don't view the court as a passive institution, we don't think that the court doesn't ever go beyond what the parties submit, but the court does expect and it has to expect as a practical matter and as a constitutional matter to be the recipient of the fruits of the adversary system. It cannot assume otherwise in any given case. And I submit to the court that it decides case after case on the assumption well founded that it has competent counsel, that have sharpened the issues, that recognizes that the adversary process is both punching and counter-punching and there is "catch 22" here. We go back and try to step into the shoes a little bit presumptuously, two members of the division here, we step into the shoes of the original division. The more that division or any division assumes that counsel on direct appeal was competent because he filed a brief and wrote english and raised some issues, then the less it would have reason to believe that counsel was not giving the court information. The government makes much of the point that this was a respected trial attorney. I well agree. But any attorney, certainly a respected trial attorney knows about *Drew*—there is hardly a more basic jurisprudential point in the District of Columbia criminal case law—and knows that it has two prongs; and where the government says in its brief, "regardless of what you decide about the mutual admissibility, you should conclude that the trial was fair because the prosecutor separated the of-

fenses ... the appellate attorney does not respond." This court—any court—that assumes counsel to be competent has every reason to believe—to rely on the belief—that it knows what happened and that the trial in fact could have been conducted on the separate and distinct theory.

What appellant is arguing to the court is that (a) "we don't think the court doesn't ever go beyond what the parties submit," but on the other hand, (b) "the court does expect, and it has to expect as a practical matter and as a constitutional matter, to be the recipient of the fruits of the adversary system," and (c) "I submit to the court that it decides case after case on the assumption well founded that it was competent counsel, that have sharpened the issues, that recognizes that the adversary process is both punching and counter-punching...." Furthermore, says appellant, "[t]he more ... any division assumes that counsel on direct appeal was competent because he filed a brief and wrote english and raised some issues, then the less it would have reason to believe that counsel was not giving the court information."

So that there may be no mistake about it: the court does not subscribe to appellant's position that the court decides "case after case on the assumption well founded that it has competent counsel...." In reality, says appellant, "[t]he more ... any division assumes that counsel was competent ... then the less it would have reason to believe that counsel was not giving the court information." If an appellate court were to fall into that dereliction then we agree that unfortunate consequences would follow.

Though we recognize that appellant's argument is adversarial and perhaps adapted to support its position in this particular case, we believe we should set this matter to rest so there will not be any future misunderstanding about it. Contrary to appellant's argument, the court does not rest its decision-making on any assumptions—one way or the other—regarding the competency of counsel.

In its review, the court considers the briefs and the oral argument, and tests them against the record and the law. It does not decide cases "on the assumption well founded that it has competent counsel...." As we have indicated, able and industrious counsel are most certainly a valuable aid to the court in the decision-making process. On the other hand, less able and non-industrious counsel put an added burden on the court in reaching a decision. But in the final analysis the court must satisfy itself—without regard to the gradations of competency of counsel—on the decision to reach, with the reasons supporting it.

It is quite apparent that appellant's claim is not a realistic standard to apply to the test of due process of law in the matter of effective assistance of counsel in a criminal case.[21] Actually, it is not an uncommon experience for an appellate counsel to (a) neither anticipate nor respond to one of the points of the adversary's argument in its brief, and (b) fail to direct the appellate court to those portions of the record where rebuttal of the adversary's point is demonstrated. This is not to say we intend to encourage, by excessive tolerance, the proposition that counsel need not explore all material facets of its position as a matter of sound appellate advocacy. Rather, we are pointing to the realities of the appellate world in the process of evaluating the facts in order to determine, as a matter of constitutional law—with all that this implies—whether an appellant had been denied due process by being deprived of his right to the effective assistance of counsel.

Bringing this issue into the actuality of appellate decision-making, we have here a case where the appellate counsel under attack for rendering "ineffective assistance" has correctly raised in his brief the focal issue of this appeal (consolidation of offenses). He explained the issue, drew attention to the appropriate rules of procedure, and related two principal, prejudicial danger points in permitting consolidation of offenses. Having laid this foundation and then having explained quite briefly the various facets of the landmark *Drew* opinion, counsel then proceeded to argue that the "mutual admissibility" doctrine was not applicable.[22]

He then concentrated on the ground relied upon by the trial judge for permitting consolidation of the offenses, *i.e.*, the "mutual admissibility" doctrine. It is quite understandable that counsel would level his main attack against the particular basis the trial judge invoked for permitting the consolidation.

We come to the issue which we have sought to sharpen. Was appellant afflicted with ineffective assistance of counsel when (a) counsel did not carry the joinder issue one step further, nor (b) did he anticipate or counter in a reply brief the government's argument that, alternatively, the offenses were tried "separately and distinctly" thereby removing any prejudice, nor (c) did he refer the court to the record where it would be demonstrated they were not tried "separately and distinctly"? We conclude this omission does not pose a serious constitutional issue.

While counsel should have exhausted this subject with appropriate record references, we conclude this does not ascend to constitutional significance. Appellant contends it does because "[h]ad appellate counsel not failed completely to demonstrate that 'separate and distinct' had no basis for application to Watson's trial, the panel's decision that the trial court's mutual admissibility ruling was error would have required that the convictions be reversed and Mr. Watson given a new trial." It would be an unhealthy precedent to tie constitutional ineffectiveness of counsel to the test of whether an appellate court (or a division

---

**21.** It will collaterally be borne in mind, again, that we have here no equal protection of the law issue in the matter of appointed counsel. Counsel here was retained by appellant, and, as both parties agree, is recognized in this jurisdiction as able and experienced in the criminal law field.

**22.** *But see infra* p. 1071, where we explain that reasonable minds might well conclude that this case presented a classical instance where "mutual admissibility" applied.

thereof) decided a case "correctly" when, due to counsel's efforts, it well knew what the crucial issue was, as well as the applicable law and its various ramifications. In relation to the "separate and distinct" omission, the court had previously spoken on "separate and distinct" in one of the cases specifically cited to it by counsel, *Bell v. United States, supra,* 332 A.2d at 353–54.

We know of no case involving "ineffective assistance" which even approaches the relatively moderate omissions of counsel in this case, constitutionally speaking. No Supreme Court decision remotely implies that the factual situation in this case is reached by its pronouncements on ineffective assistance of counsel. *See, e.g., Kimmelman v. Morrison,* 477 U.S. 365, ——, 106 S.Ct. 2574, 2588–89, 91 L.Ed.2d 305 (1986) (where the Court held that counsel rendered ineffective assistance in his total failure to conduct pretrial discovery and to raise fundamental objections to illegally seized and incriminating evidence).

The charge here by appellant is that counsel did not "adequately" present the "joinder" issue as an advocate. Significantly, it is not that he did not raise the "joinder" issue but, rather, that he did not raise it "adequately." Stating the proposition almost answers it, if one bears in mind that a constitutional "due process" test must be applied to counsel's performance. The Supreme Court in *Strickland* said "[t]he benchmark for judging [this] claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [appeal] cannot be relied on as having produced a just result." 466 U.S. at 686, 104 S.Ct. at 2064.

The Supreme Court has enjoined us to "eliminate the distorting effects of hindsight," *Strickland v. Washington, supra,* 466 U.S. at 689, 104 S.Ct. at 2065, and to avoid treating the claim as an opportunity "to grade counsel's performance." *Id.* at 697, 104 S.Ct. at 2069. Here, counsel addressed the principal problem in relation to the *Drew* question, *i.e.,* whether the trial court was correct in ruling the evidence relating to the three offenses was "mutually admissible." Counsel convinced the court on appeal that the trial judge was wrong on this crucial ruling. Counsel neglected to then dispose of a remaining issue raised by the government, in its brief, the "separate and distinct" exception, which this court proceeded to recognize.[23] Though counsel would have been well advised to treat this in a reply brief, or on oral argument (concerning which we have a blank, as we have explained) this is not a failure of constitutional dimensions. If we were to so regard it, we would be faced wholesale with reversals on this constitutional basis and repeated analysis of the kind taken here of an earlier appellate brief.

Any shortcomings do not approach the gravity of "[professional] errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair [hearing]." *Id.* at 689, 104 S.Ct. at 2065.

On this record, we conclude the deficiency claimed does not rise to the level of a constitutional deprivation of the right to counsel.

### B. *Prejudice*

We turn now to consideration of the prejudice component.[24] In this case there is a variation of the prejudice consideration. In

---

**23.** We deal with this later in discussing the "prejudice" prong on the ineffective assistance of counsel claim. *See Strickland v. Washington, supra,* 466 U.S. at 691–98, 104 S.Ct. at 2066–70.

**24.** In view of our conclusion that counsel was not constitutionally ineffective, it would not normally be required that we also discuss lack of prejudice under the second prong of *Strickland, supra.* But because this is an *en banc* decision on a relatively new and important issue we will proceed to discuss the second prong of the *Strickland* test.

*Strickland,* the Court said the test on prejudice is whether "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Here, the prejudice test is whether, even assuming appellant is correct, if the appellate proceeding were recommenced, the result (affirmance) would be different.

The sensible question to resolve here in relation to the prejudice prong is whether, if it were assumed counsel might have been constitutionally ineffective in not arguing the "separate and distinct" point, the result would be different if the mandate were recalled and a division of the court (or the court *en banc*) should then decide to rehear the appeal once again on the merits. The answer is that this would be a wasted procedure as it is plain that there would be another affirmance. The reason we so conclude is because it is evident that evidence on the three charges clearly was "mutually admissible," for reasons we will explain.

The essence of the prejudice prong of the *Strickland* test is that unless the appellate court concludes "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. at 2068, no worthwhile purpose would be served in conducting an analytical examination of prior appellate counsel's performance. More precisely, even if we were willing to assume that counsel was constitutionally deficient by not entirely exhausting all the facts of the *joinder issue* on the direct appeal,[25] is there a "reasonable probability" that this court would then reverse and remand for a new trial?

The trial judge permitted joinder of the offenses on the theory of "mutual admissibility." That is to say, joinder was permitted because the offenses charged fit under one or more of what are popularly referred to as the *Drew* exceptions, *i.e.,* the exceptions stemming from modus operandi ("signature crimes"), "motive" and "identity." We are not aware of a reported decision in

this jurisdiction dealing with a "joinder of offenses" issue where there were involved offenses more clearly qualifying for the "signature crimes" exception. There was a compelling manifestation of the required "distinctive facts and circumstances" in the three offenses charged. We will demonstrate this now.

Appellant had a weird view regarding the house belonging to his girlfriend, which had been the subject of settlement negotiations with her estranged husband. He openly harbored a mindless attitude toward possession of the house for more than a year, until his arrest in this case. Concerning the first assault charge, the assault occurring in the house in question, appellant pointed a handgun at a guest of the estranged husband, who was alone as the husband had left temporarily, and he ordered him out of the house—for no rational reason. Later on, during divorce negotiations between his girlfriend and her estranged husband, and while the latter was still in possession of *the same house,* appellant broke in the door *at 4:30 a.m.* and went upstairs and was seen to fire three shots at the estranged husband and the husband's girlfriend *as they lay in bed.* This founded the assault with intent to kill charge. Next, about a year later, and after his girlfriend obtained possession of *the same house,* the tenant announced an intention to leave soon, at the end of the lease. Her son said he would stay there until the lease actually expired. Appellant wanted the house vacated immediately and announced he was going to the house *at night* to accomplish his strange purpose. The threatened son of the tenant was found dead the next day in *the same house,* for the same weird reason, from a gunshot wound and stab wounds.

All these inexplicable crimes came from the same idiosyncratic, individualized motivation, *i.e.,* using a gun to mindlessly drive residents or tenants out of this particular house, or to attempt to kill them if they did

---

**25.** In reality, the charge here leveled against prior counsel does not approach factually the derelictions of counsel in *Strickland, supra,* 466 U.S. at 672–77, 104 S.Ct. at 2056–59; *Evitts,* *supra,* 469 U.S. at 389, 105 S.Ct. at 832; *Anders, supra,* 386 U.S. at 740, 87 S.Ct. at 1398; or *Gideon v. Wainright,* 372 U.S. 335, 337, 83 S.Ct. 792, 793, 9 L.Ed.2d 799 (1963).

not leave, without regard to their right to be there. All these were committed in the same house concerning which he had the mysterious fixation.[26] All three involved a gun; one time murder nearly resulted; the third time a murder actually resulted.

This is a classic demonstration of crimes with the same modus operandi (signature crimes). A striking similarity of circumstances has also been recognized by this court as coming within the "identity" exception under the *Drew* doctrine.[27]

As the trial court understandably ruled, evidence of the three crimes was "mutually admissible" and joinder was proper for this reason.[28] The probativeness of these distinctive circumstances is unmistakeable. They were sufficient to "earmark [the crimes] as the handiwork of the accused." [29]

█ This being so, the "separate and distinct" question vanishes as a material issue in this case.[30] Where offenses are

**26.** While there was a one year time span between the second and third crimes, we regard that as immaterial in this case due to this particular factual setting. It will be recalled that there were eyewitnesses to the two assaults, but not to the murder.

**27.** *See, e.g., Artis v. United States,* 505 A.2d 52 (D.C.1986) (evidence of prior burglary in defendant's trial for second degree burglary not error as there was a clear, definite kind of earmark similarity to it which fit within the *Drew* identity exception, *viz.,* defendant knew and associated with both complainants; he determined that complainants would not be present when the burglaries were attempted; he recruited juveniles to assist him; he falsely told the juveniles he had a right to the property; he went to the respective scenes of the burglaries and supervised the juveniles from nearby; and he encouraged the juveniles by feigning a willingness to obtain the property himself); *Cox v. United States,* 498 A.2d 231 (D.C.1985) (denial of severance motion in trial for two separate sexual assaults proper where both crimes occurred in the same general wooded area only two days apart; the victims were approached identically—from the side with the same type of gun; each victim was initially robbed; the assailant gave similar instructions to both victims; and the victims gave parallel descriptions of the attackers and his car); *Brooks v. United States,* 448 A.2d 253 (D.C.1982) (denial of motion to sever two separate rapes and related offenses upheld as evidence of each assault would have been admissible at separate trials as to the identity of the perpetrator based on the nature of the comments made by the rapist to the victim; the length of the assault; the use of the victim's underwear to bind her hands; the two incidents took place within a nine-day time span, at approximately the same time of night in wooded park areas of the northwestern part of the District; and both victims were young women, walking alone, who were approached in a similar manner); *Warren v. United States,* 436 A.2d 821 (D.C.1981) (refusal to sever counts stemming from four separate incidents of kidnapping and sexual assaults was not improper as the facts combined to form a unique signature and pointed to the *modus operandi* of a single team of wrongdoers; *viz.,* all incidents involved

abduction and rape of women around twenty years old; car used in each incident was described identically; each victim was standing on the street waiting for transportation when accosted; all abductions took place after sunset and before midnight; all victims were driven to deserted locations and threatened with deadly weapons); *Bridges v. United States, supra,* 381 A.2d 1073 (a composite feature or mark identifying the wrongdoer was found to support joint trial for four different rapes from the facts that each rape occurred between 1:00 and 4:45 a.m.; all took place within a six-month time period; each took place in the same general area of Southeast Washington; in each incident the rapist broke into the rear of the victim's dwelling, where the victim was the only adult in the building, each was threatened with a weapon, and a single sex act followed).

**28.** It should be noted here that the trial judge in this case explicitly charged the jury to consider each charged offense separately at different points during the instructions. The trial court stated at the outset:

Each of the offenses must be considered individually and separately. You may find the defendant not guilty of any offense. You may find him guilty of one offense and not guilty of the rest. You may do what you deem, but you must consider each charge separately.

And then later on, before sending the jury in to deliberate, the court reminded them: "Remember, you should consider each date and incident separately." *Id.* at 1091. The jury later demonstrated they understood the court's instruction as they returned separate verdicts at the conclusion of different segments of the deliberations. *Id.* at 1093.

**29.** *Bartley v. United States,* 530 A.2d 692, 705 (D.C.1987) (Mack, J., dissenting).

**30.** If the evidence as to each joined offense is ruled to be "mutually admissible," then by definition there is no requirement that such "mutually admissible" evidence also be kept "separate and distinct" during the trial. *See Arnold v. United States,* 511 A.2d 399, 405 (D.C.1986) ("de-

correctly joined on a "mutually admissible" basis it is not comprehensible that they must be, or could be as a matter of reality, kept "separate and distinct." *See, e.g., Bell v. United States, supra; Cox v. United States, supra.* Some overlapping of proof is expected under this particular theory, by its nature, because evidence on one of the charged offenses is considered probative in establishing another of the charged offenses.

### CONCLUSION

Our review discloses that the performance of counsel for appellant on the first appeal was not ineffective as a matter of constitutional law. Furthermore, even if we were to assume it was, there would be no point in granting the motion to recall the mandate and remand the proceeding for a new trial, because our review leads us to conclude the element of prejudice is lacking as the result reached (affirmance of the conviction) by the hearing division on the first appeal was clearly correct.

Accordingly, the motion to recall the mandate is denied. The judgments of the trial court in the § 23–110 and *habeas corpus* proceedings are affirmed.[31]

*So ordered.*

NEWMAN, Associate Judge, with whom MACK, Associate Judge, joins, concurring:

I am not as sanguine as is Judge Gallagher's opinion of the efficacy of this court's review of cases where the performance of counsel is less than that to be desired. However, I am satisfied on the record in this case that the performance of counsel in this case did not fall below the minimum of what is reasonable. Whether or not the original affirmance of Watson's conviction was the result of a flawed appellate process, it was not the result of constitutionally ineffective counsel.[1]

Statement of Associate Judge BELSON, with whom ROGERS, Associate Judge, joins:

I concur in the result reached by the plurality. I am convinced that appellate counsel's representation was not ineffective. I am so convinced because he not only raised and briefed the mutual admissi-

---

nial of severance can be sustained on either ground").

We might note, in passing, that the meaning of the term "simple and distinct" has become blurred over the years. *Compare Drew v. United States,* 118 U.S.App.D.C. 11, 14, 331 F.2d 85, 88 (1964) (where "evidence of each crime is simple and distinct") *with Bridges v. United States,* 381 A.2d 1073, 1075 (D.C.1977) (using term "separate and distinct" to describe the presentation of evidence), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978) *and Arnold, supra,* 511 A.2d at 405–06 (analyzing the presentation of the evidence in determining "the jury could, and did, keep the evidence relating to the two incidents separate and distinct"). At times, the terms appear to be used interchangeably. *See, e.g., Arnold v. United States,* 443 A.2d 1318, 1323 (D.C.1982) (using both terms).

In a relatively old case, Judge Learned Hand demonstrated the meaning of the "simple and distinct" doctrine in *United States v. Lotsch,* 102 F.2d 35 (2d Cir.), *cert. denied,* 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500 (1939). He stated:

Here we can see no prejudice from the joining of the three charges: The evidence to each was short and simple; there was no reasonable ground for thinking that *the jury would not keep separate what was relevant to each. Id.* at 36 (emphasis added).

In *United States v. Lewis,* 547 F.2d 1030 (8th Cir.1976), the court stated: "Here, the evidence of each crime was simple and distinct, and there was little danger of the jury cumulating the evidence." *Id.* at 1033 (citations omitted).

Over the years, the term "separate and distinct" has crept into the discussion of joinder of offenses issues. It is usually used in the context of the presentation of evidence, apparently in order to keep the offenses "simple and distinct" in the minds of the jurors. *See, e.g., Jaggers v. United States,* 482 A.2d 786, 795 (D.C.1984) (government presented evidence in a separate and distinct manner so that the "jurors were able to keep separate … the evidence as to each offense"); *Bridges, supra,* 381 A.2d at 1075 (same).

This is all very well, but it might be kept in mind that the focus essentially should be on whether the evidence itself is, in fact, simple so that a reasonable juror can keep the relevant evidence of each offense "separate and distinct," though perhaps the latter phrase carries with it a certain redundancy.

31. We have already disposed of the other issues preserved, though not argued, on this appeal. *See supra,* note 2.

1. I specifically join in footnote 30 of Judge Gallagher's opinion.

bility point regarding severance, but also brought the "simple and distinct" point sufficiently to this court's attention so that if this court went on to hold (as it did) that counsel was correct that evidence of the offenses was not mutually admissible, this court would have been duty bound to examine the trial record to see whether the charges were capable of being tried, and were tried, in a sufficiently separate and distinct manner. That is the sort of issue that will invariably require the court to survey the record itself. If counsel had argued the issue and had supplied appropriate citations to the record, it would have been helpful to the court and, undeniably, to appellant as well. I think, however, that the failure to do so, especially in the context of an appeal in which other points were adequately presented, did not constitute ineffective assistance of appellate counsel. *See Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984).

FERREN, Associate Judge, dissenting:

I see this case from a different perspective—a perspective that leads to reversal.

## I.

It is not clear why Judge Gallagher, writing for a plurality, has bothered to discuss the second, prejudice prong under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Ante* at 1069–1072. That discussion is unnecessary in light of the plurality's conclusion that appellate counsel was not constitutionally deficient. But, my colleagues have done so and, in the process, have concluded there was no prejudice from consolidation of the indictment charging first degree murder of Timothy Reeves with the indictment charging an armed assault against Richard Knight and an assault with intent to kill while armed against Robert Swearinger and Cynthia Durham. The plurality perceives no prejudice because—contrary to the unanimous conclusion of the division that heard Watson's direct appeal—"it is evident that evidence on the three charges was 'mutually admissible.'" *Ante* at 1070.

Consequently, suggests the plurality, the original division on direct appeal that rejected mutual admissibility, but affirmed on another ground, made too much of the case as it was.

My colleagues' conclusion that the "signature crimes" exception justified mutual admissibility is simply wrong. Unfortunately, neither in the division opinion on collateral attack, *Watson v. United States,* 508 A.2d 75 (D.C.), *reh'g granted, judgment vacated,* 514 A.2d 800 (D.C.1986), nor in the en banc opinion are the facts sufficiently elaborated to make this issue and its resolution clear. Accordingly, I have attached as an appendix the unpublished memorandum opinion and judgment on the direct appeal, for it contains the recitation of events necessary to understand the consolidation issue. Once it is clear that consolidation could not properly have rested on the "signature crimes" exception, I hope it will become evident why much of the plurality's analysis unravels.

### A.

Pursuant to Super.Ct.Crim.R. 13, the trial judge "may order 2 or more indictments ... to be tried together if the offenses ... could have been joined in a single indictment." Offenses may be joined in a single indictment under Super.Ct.Crim.R. 8(a) if they "are of the same or similar character or are based on the same act or transaction or on two or more transactions connected together or constituting parts of a common scheme or plan." Because the incidents at issue were not part of the same act or transaction, our inquiry focuses on whether the assaults and the murder were of a sufficiently similar character, or were related enough through a common scheme or plan, to warrant a joint trial—or whether, instead, the trial court abused its discretion in ordering the offenses tried together. *Grant v. United States,* 402 A.2d 405, 407–08 (D.C.1979). "The appropriateness of joinder in evidence-of-other-crimes cases must be determined by balancing inevitable prejudice to the defendant caused by the joinder against the legitimate probative force of the evidence and expedition in judicial administration." *Tinsley v. United*

*States,* 368 A.2d 531, 533 (D.C.1976) (citing *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964)).

The types of prejudice likely to arise when multiple offenses are tried together were outlined in *Drew:*

> [T]he defendant may be prejudiced for one or more of the following reasons: (1) he may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find.

*Id.* at 14, 331 F.2d at 88. If, however, evidence of one of the crimes charged would be admissible in the defendant's separate trial on the other, the last two types of prejudice need not be weighed in the balance.[1] Because the jury would have evidence of the other crime before it anyway, the possibility that the jury would cumulate the evidence or infer a criminal disposition already exists. In cases of mutual admissibility, therefore, the court already has determined that the probative force of the other crimes evidence outweighs the prejudicial danger.

Although, as a general rule, evidence of other crimes is not admissible in a criminal trial, *Drew* explains that other crimes evidence is admissible if relevant to:

> (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of

the person charged with the commission of the crime on trial.

*Id.* at 16, 331 F.2d at 90 (footnote omitted). In denying Watson's motion for a new trial, the trial judge stated that the indictments were not improperly joined because "the evidence of the first two offenses could have been used in the murder trial to show motive or intent. The evidence clearly showed a pattern of action and a state of mind of the defendant, which was relevant to the murder charge." Thus, the court (without clearly justifying *mutual* admissibility) appeared to invoke four of the five *Drew* criteria.[2] Interestingly, the government on direct appeal defended mutual admissibility only on the basis of "motive." Because my colleagues perceive "signature" crimes, however, I will discuss that "identity" issue as well.

Evidence of other so-called "signature" crimes, where remarkably similar elements reveal a common "modus operandi," will be admitted to establish identity. *See Bridges v. United States,* 381 A.2d 1073, 1075–78 (D.C.1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978); *Arnold v. United States,* 358 A.2d 335, 338–39 (D.C. 1976) (en banc). Two decisions of this court illustrate the virtual uniqueness implied by a "modus operandi" or "signature": *Calaway v. United States,* 408 A.2d 1220, 1226 (D.C.1979) (evidence of prior assault admissible to show modus operandi where government alleges that, in both prior assault and offense charged, defendant approached a young woman on pretense of looking for room to rent, forced her to remove her clothes, subdued her with a blow to the jaw, climbed atop her and strangled her); *Crisafi v. United States,* 383 A.2d 1, 4–5 (D.C.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 322, 58 L.Ed.2d 326 (1978) (evidence of prior rape admissible to

---

**1.** Watson does not contend that he was confounded in the presentation of his defenses by consolidation of the indictments, so we need not consider the first type of prejudice.

**2.** The term "pattern of action" used by the trial judge could encompass both the identity and the common scheme or plan criteria. I will discuss "identity" in the text below. The dissimilarities in the character of the crimes, coupled with the passage of more than one year between the

assaults and the murder, belie any implication that the three crimes were part of a "common scheme or plan." *See Tinsley v. United States,* 368 A.2d 531, 534 n. 4 (D.C.1976) ("The dissimilarities in the two homicides and their separation as to time of occurrence by nearly six months excludes any theory of common scheme or plan.") Finally, no one suggests that the intent exception applies.

show modus operandi where government alleges that, in both prior rape and offense charged, defendant approached a woman in a public place and introduced himself as "Simone," later telephoned the woman, saying he was "George," Simone's roommate, and urging her to date Simone, and then attempted to rape her on the resulting "date").

In the present case, the crimes themselves—the assaults and the murder—were not so remarkably similar that they betray the identity of the perpetrator. *Cf. Calaway; Crisafi.* Indeed, the common elements are far from strikingly similar. Although these were all crimes of violence, the two assaults—one a threat, the other a shooting—were committed exclusively with firearms, whereas the murdered Timothy Reeves suffered both gunshot wounds and multiple stabbings. The crimes also differed in severity: threatening with a gun, as in the Richard Knight assault, is a far cry from murder by gunshot and stab wounds. Finally, the fact that the assaults and the murder took place in the same house does not make otherwise distinguishable crimes remarkably similar to the point of suggesting a common "modus operandi" or "signature," especially because nothing about the house itself figured in the manner in which the crimes were committed.

This case is even a weaker candidate for the "signature" crimes label than we found in *Tinsley, supra,* where, in both cases, the homicides were by strangulation after the victim had been seen drinking with the defendant. We stressed that the methods of strangulation were different and that the injuries were not so unique as to suggest the "signature" of the killer. *Id.* at 534–36; *See Bridges,* 381 A.2d at 1076. In the present case, the connection between the victims is certainly no greater than in *Tinsley*—a location in common for the violence here, compared with drinking in common in *Tinsley*—and the methods of vio-

lence are more dissimilar than in *Tinsley.* Frankly, it is inconceivable to me how my colleagues could have carefully focused on these facts and yet concluded that this case reflects "a classic demonstration of crimes with the same modus operandi (signature crimes)." *Ante* at 1071. The facts simply do not meet the test.

The government urged affirmance on direct appeal for an altogether different reason: the crimes revealed the same motive —a desire to eject someone from the Quincy Street house. Such a superficial connection, however, is not sufficient to establish a motivation sufficient for mutual admissibility. Other crimes evidence can only be admitted under the motive exception when one crime is probative of the reason or incentive for committing the other. For example, in *Horton v. United States,* 377 A.2d 390 (D.C.1977), Horton robbed an acquaintance named Rodwell. When Horton learned that Rodwell had reported the crime to the police, he and some friends assaulted Rodwell and raped his wife. We held that the counts were properly joined in a single indictment because the evidence of one crime would have been admissible in a trial for the other: Horton's "revenge" motive in the rape and assault was inextricably linked to Rodwell's reporting the robbery.[3]

The same is true of the two assaults in this case, which were linked by a common motive and, therefore, appropriately joined in a single indictment. Watson originally threatened Richard Knight, a friend of Robert Swearinger, in order to get him out of the house. Watson thereby wanted to communicate to Robert Swearinger, who lived there, that Watson and Joan Swearinger (Robert Swearinger's estranged wife who lived with Watson) intended to take over the house. The underlying motive was for Watson and Joan Swearinger to reap some economic benefit from the house, which they believed to be her prop-

**3.** *Accord, United States v. Cyphers,* 553 F.2d 1064 (7th Cir.), *cert. denied,* 434 U.S. 843, 98 S.Ct. 142, 54 L.Ed.2d 107 (1977) (proper for government to introduce evidence of an intended heroin purchase as evidence of need for a large sum of money as a motive in a robbery trial);

*United States v. Johnson,* 542 F.2d 230 (5th Cir. 1976) (prior conviction and outstanding arrest warrant were admissible in trial for threatening officers to show why defendant had a motive to try to escape).

erty. Under the same "claim of right," Watson shot Robert Swearinger and Swearinger's friend, Cynthia Durham, only six days later. The purpose was the same: to scare Robert Swearinger out of the house.

The same reasoning does not apply to the murder of Timothy Reeves. Reeves occupied the house over a year later under a rental agreement between Reeves' mother and Joan Swearinger, not by a claim of ownership as Robert Swearinger had asserted. Reeves' mother had informed Joan Swearinger that she and her family would be moving out. She planned to go by June 28 but her son would stay until July 1. Watson apparently wanted Reeves out before July 1 simply because Watson wanted to clean the house before a new tenant moved in. Watson did not have a continuing desire or need to keep the house empty, which could be the only possible motive linking the three crimes. To the contrary, the evidence indicates that Watson and Joan Swearinger sought out paying tenants. Watson's purpose—his motive in wanting Timothy Reeves out of the house—was entirely different from his purpose in seeking to evict Robert Swearinger. Therefore, a common motive cannot be said to link the three crimes.

Under the government's theory, "motive" means little more than "propensity." Because Watson had used guns to scare people out of the house on two previous occasions, the government asked the jury to believe that he used deadly force to eliminate an intervenor a third time.[4] That is "the very inference that the general rule of exclusion of other crimes evidence is designed to prohibit." C. WRIGHT & K. GRAHAM, 22 FEDERAL PRACTICE AND PROCEDURE, § 5239 at 460–61 (1978) (footnote omitted). The first degree murder charge, therefore, should not have been consolidated for trial with the two assaults on the

ground of mutual admissibility of the evidence of the other crimes.

**B.**

The division on direct appeal accordingly was correct that neither the "signature" crimes exception, nor the "motive" exception, nor any of the others justified mutual admissibility. Furthermore, I believe the division was clear that it would have found plain error requiring reversal but for its conclusion that the evidence of each crime was "simple and distinct," affording separate presentation of each without confusion. Under *Drew*, this "simple and distinct" evidence alternative allows consolidation of two indictments for trial "even though [the other crimes] evidence might not have been admissible in separate trials." *Drew*, 118 U.S.App.D.C. at 17, 331 F.2d at 91. The division on direct appeal concluded the argument was "sufficiently strong for consolidation on this basis that the trial court did not commit plain error in failing, absent objection, to sever the murder and assault charges." Appendix at 1083.

Watson's contention on collateral attack is uncontested: the government did *not* try the assault and murder cases separately, such that the evidence as to each was "simple and distinct"; nor were the cases kept separate in closing argument. *Supra* note 4. Significantly, the government in its supplementary brief and at oral argument to the en banc court did not dispute this contention. Nor does any of my colleagues. Indeed, the operating premise of everyone concerned is that the division on direct appeal was absolutely wrong in so concluding.

Watson contends that counsel on direct appeal was at fault—indeed, constitutionally ineffective—in failing to point out to the court a government misrepresentation on page 23 of its brief filed July 17, 1979,

---

**4.** For example, in closing argument the prosecutor stated: "Mr. Reeves made the mistake of doing the same thing that Richard Knight and Robert Swearinger did. He wanted to stay in the house." The prosecutor stated further: "He [Watson] went into that house on two different occasions and either killed or tried to kill sleep-

ing people." Finally, the prosecutor argued: "[T]he Government asks you to look at the circumstances of this case, to look at the similarity between all of the cases and the way they were committed and the motive. Why was each one of these people assaulted, maimed, murdered?"

which the division obviously accepted, that the "simple and distinct" exception applied on this record.[5] I agree with my colleagues that, although counsel should have filed a reply brief pointing out the government's misleading advocacy, counsel did do a job sufficiently professional to withstand constitutional attack. The division obviously knew the relevant caselaw and was sufficiently directed to the record to have to bear responsibility for its own plain error in resolving the appeal.

But this does not end the inquiry, for the plurality sweeps under the rug the other critical issue: the alleged ineffectiveness of trial counsel in failing to press for a severance of offenses before trial and, especially, as the trial progressed.

## II.

### A.

In a footnote, *ante* at 1057 n. 2, the plurality incorporates the discussion of alleged ineffectiveness of trial counsel in the division opinion on collateral attack. *Watson*, 508 A.2d at 88–91. There, the court found no ineffectiveness of trial counsel because the division on direct appeal had found no plain error:

> By concluding on appellant's direct appeal that there was no plain error, *i.e.*, no error affecting substantial rights, we were saying in effect that in all probability the purported error would not have affected the outcome of his trial. This being so, counsel's failure to notice such error at trial cannot be deemed "ineffec-

5. Absent a transcript, I cannot properly address oral argument on direct appeal.

6. Assume counsel moves for a severance and the trial court errs in denying the motion. The defendant will prevail on appeal unless the government carries the burden of proving the error harmless. Next, assume counsel, in the same case, fails to move for a severance. In that instance, the defendant has the burden of proving either plain error or prejudice from ineffectiveness of counsel. As a consequence of this shift in the burden of proof and the standard for reversal, the defendant very likely will fail even though he or she would have received a new trial had counsel preserved the error. This does not necessarily mean, however, that an appellate court equates review of the alleged

tiveness" within the context of *Strickland*, since perforce there is no reasonable probability that absent counsel's (assumed) failure the result of the proceeding would have been different.

*Id.* at 89 (citations omitted).

This analysis falls short.[6] First, it is important to put the ineffectiveness issue in the context of harmless error and plain error standards of review. Theoretically, on an appellate record there may not be plain error requiring reversal for failure to grant a severance, even though there would have been harmful error, and thus reversible error, if counsel had called the grounds for severance to the trial court's attention. *Allen v. United States*, 495 A.2d 1145, 1152 (D.C.1985) (en banc). More specifically, under the nonconstitutional standard for harmless error in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1239 (1946), an appellate court, when addressing an error preserved for review, must reverse when it cannot say with fair assurance that the verdict was not substantially swayed by the error. Under the constitutional standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the appellate court must reverse unless it concludes the error was harmless beyond a reasonable doubt. In contrast, a court will not reverse for plain error unless "the error complained of is so clearly prejudicial to the complainant's substantial rights as to jeopardize the very fairness and integrity of the trial." *Allen*, 495 A.2d at 1154. Roughly, therefore, the difference between

ineffectiveness of trial counsel with review for plain error. At least, we have never carefully reasoned and clearly held that in every case the *Strickland* test for prejudice (a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different") is the same as the traditional test for finding plain error ("the error complained of is so clearly prejudicial to the complainant's substantial rights as to jeopardize the very fairness and integrity of the trial"). In sum, it is not necessarily true that our respective standards of review for plain error and for ineffectiveness of trial counsel are congruent. If they were, by the plurality's logic a finding of plain error would imply, in every case, ineffectiveness of counsel.

harmless error and plain error analysis is that the former mandates reversal if the error might have affected the outcome whereas, according to my colleagues, the latter mandates affirmance unless the error probably would have affected the outcome.

The plurality states that the *Strickland* test for prejudice from ineffectiveness of counsel appears to be the same as the prejudice inherent in plain error. As stated by my colleagues, however, reversal for plain error virtually presupposes that the error is outcome-determinative, whereas the Supreme Court in *Strickland* called such an approach "not quite appropriate" for ineffectiveness claims. 466 U.S. at 694, 104 S.Ct. at 2068. The tests for prejudice, therefore, are not the same.

There is, however, another critical distinction. We might find no plain error from the trial court's failure *sua sponte* to grant a severance, were we to conclude that separate trials probably would not have affected the likelihood of conviction. We also might find no ineffectiveness of trial counsel if our review were to focus on whether the separate trials that counsel failed to achieve would have made any difference. But there is another way to look at ineffectiveness of trial counsel: an objection noting the error might have caused the trial court to grant the severance; but, even more importantly, if the trial court did err, counsel's objection *would* have caused the appellate court to reverse, and grant separate trials, because the error was not harmless on a record that would not permit reversal for plain error. In short, the test for prejudice in *Strickland* arguably should be directed at the impact of counsel's failure on the appellate standard of review, with the consequent prospects for reversal and a new trial, not directed solely at the question of probable acquittal as in plain error review.

I am aware that the Court in *Strickland* focused on whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"—on "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt"—on whether "the decision reached would reasonably likely have been different absent the errors." 466 U.S. at 694, 695, 696, 104 S.Ct. at 2068, 2069. I am not convinced, however, that when severance is the issue this emphasis on the reasonable probability of a different result would preclude factoring into the analysis on appeal the certainty of reversal and remand for new trials, without prejudicial other crimes evidence, had counsel preserved harmless error review. Accordingly, I conclude that the plurality's equating of plain error and ineffectiveness-of-counsel review is defective.

**B.**

Even if, on this record, the inquiries as to prejudice would be the same for plain error and ineffectiveness-of-counsel review, there is still a critical flaw in the plurality analysis: by rule of court, resolution of a plain error inquiry on direct appeal does not preclude consideration of an ineffectiveness issue, addressing the same subject matter, on collateral attack.[7] We have expressly urged counsel on direct appeal to eschew ineffectiveness claims, leaving them for collateral attack when a more complete record can be made. *See Proctor v. United States*, 381 A.2d 249, 252 & n. 4 (D.C. 1977). It follows that, if an ineffectiveness claim on direct appeal does not necessarily preclude a collateral attack on the same ground, *see id.*, we have implicitly announced a rule of law that plain error determinations on direct appeal do not necessarily preclude ineffectiveness claims on collateral attack either, even though they may concern the same trial defect.[8] We

---

**7.** *Cf.* Restatement (Second) of Judgments § 20(c) (1982) (personal judgment for defendant, although valid and final, does not bar action by plaintiff on same claim where by statute or court rule such judgment does not operate as a bar), *quoted with approval in Rhema Christian*

*Center v. D.C. Bd. of Zoning Adjustment,* 515 A.2d 189, 196 (D.C.1986).

**8.** In *Proctor v. United States,* 381 A.2d 249, 252 n. 4 (D.C.1977), we said:

cannot be understood to have meant something different: that ineffectiveness claims should be reserved for collateral attack, *except* when the record is complete enough for resolution of that claim on direct appeal —in which case failure to do so there, or to prevail on the issue if raised as plain error, ends the matters as in *res judicata* or collateral estoppel, respectively. If we are going to draw appellants and their counsel into that intellectual quicksand pit, then we had better do so clearly and intelligently. The plurality opinion altogether ignores these difficult preclusion issues and, I fear, may have inadvertently made some unintended law.[9]

### C.

As I see it, trial counsel's failure properly to present the severance issue to the trial court was both deficient and prejudicial under *Strickland*. Minimally effective counsel would have objected to consolidation at the outset because of a lack of mutual admissibility (counsel objected only to joinder of defendants Watson and Joan

Swearinger, not to joinder of the offenses). And, counsel should have objected as it became clear that offenses were not being tried separately within the "separate and distinct" rationale. In either case, the trial court's failure to grant such a motion would have been reversible error on this record. Trial counsel's default, resulting in continued joinder of the offenses to Watson's severe prejudice for the reasons elaborated in *Drew, see supra* Part I, reflects more than a reasonable probability that, but for counsel's unprofessional error, the result on this record would have been different. *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069. Either the trial court would have granted the severance if counsel had insisted, or this court would have found reversible error for failure to do so and ordered separate trials. In any event, I cannot agree that separate trials would not have affected the outcome; given the prejudice from the consolidation and the less-than-strong circumstantial evidence in the murder case, there is a reasonable probability that the results from separate trials

We do not intend, by our resolution of the ineffectiveness claim here or by our reference to appellant's failure to utilize D.C.Code 1973, § 23–110, to preclude the appellant from raising the issue in a collateral proceeding under § 23–110 at a later time. Our decision resolves only the specific contentions before us on the trial record. If the appellant is able to furnish better evidentiary support for the present contentions based on material not provided in the record on appeal, or to frame and document contentions of ineffectiveness which we have not considered here, he is entitled to seek collateral relief in the Superior Court. *See United States v. Brown,* 155 U.S.App.D.C. 177, 179, 476 F.2d 933, 935 (1973), and *DiAngelo v. United States,* 406 F.Supp. 880, 884–85 (E.D.Pa.1976), [*aff'd,* 566 F.2d 1168 (3rd Cir.1977),] both of which dealt with the federal analogue of our § 23–110 proceeding, 28 U.S.C. § 2255 (1970). We express no view on whether appellant has a basis for such collateral relief in this case. Accordingly, we acknowledged that appellant was not entitled to seek collateral relief for exactly the same alleged ineffectiveness of counsel, on the same record, that we considered on direct appeal. Arguably, therefore, if the ineffectiveness of trial counsel alleged on collateral attack concerned exactly the same formulation of the issue and the same portions of the record that served as the basis for plain error review on direct appeal, there may be a serious ques-

tion of preclusion. *Compare Arnold v. United States,* 436 A.2d 1302, 1303 (D.C.1981) (all issues raised or capable of being raised on review of record on direct appeal are deemed precluded from further litigation by familiar rules governing issue preclusion) *with Head v. United States,* 489 A.2d 450 (D.C.1985) (where defendant fails to raise available challenge to conviction on direct appeal, defendant may not do so on collateral attack without showing cause for failure to do so and prejudice as a result). As indicated earlier, however, I am not satisfied that ineffectiveness of counsel and plain error present exactly the same issue. Furthermore, given *Proctor* and it progeny, I do not believe counsel should be expected to know, without clearer direction by this court, that advocacy of plain error on direct appeal could preclude collateral attack for ineffective assistance of trial counsel on the same subject matter.

9. The government initially agreed that Watson cannot have been prejudiced by the failure of counsel on direct appeal to raise the ineffectiveness issue. Government Brief filed Sept. 30, 1986, at 53 n. 63. Later in the same brief, however, at 55–58, the government urged the approach adopted by the majority, *ante* at 1057 n. 2, incorporating *Watson,* 508 A.2d at 88–91: that this court's plain error review of the joinder issue on direct appeal precludes *de novo* consideration, on the same record, of trial counsel's ineffectiveness as to the same issue.

would have been different. Thus, I believe Watson is entitled to reversal and remand for further proceedings.

Respectfully, I dissent.

## APPENDIX TO DISSENTING OPINION

District of Columbia Court of Appeals

Nos. 13796, 13815

Curtis L. Watson, Appellant,

v.

United States, Appellee.

Appeals from the Superior Court of the District of Columbia

(Hon. Alfred Burka, Trial Judge)

(Argued October 31, 1979 Decided November 5, 1979)

Before Kern, Ferren, and Pryor, Associate Judges.

## MEMORANDUM OPINION AND JUDGMENT

Curtis L. Watson appeals his conviction of first degree murder, carrying a pistol without a license, assault with a dangerous weapon, two counts of burglary while armed, and two counts of assault with intent to kill while armed. As trial court error, he alleges (1) interruption of defense questioning of witnesses and improper comments on the conduct of the case by defense counsel; (2) improper consolidation of the indictment charging first degree murder with the indictment including the other counts, and (3) failure to grant a judgment of acquittal on the first degree murder charge for insufficient evidence of premeditation. We affirm.

### I.

On October 18, 1976, a grand jury indicted appellant and Joan Swearinger on charges of armed assault against Richard Knight[1] and an assault with intent to kill while armed against Robert Swearinger and Cynthia Durham.[2] The charges arose out of two incidents which took place at 1926 Quincy Street, N.E. during the time that Robert Swearinger was living at that address. He was separated from his wife, Joan Swearinger, who was living with appellant.

On May 30, 1976, Robert Swearinger was entertaining his friends, Cynthia Durham and Richard Knight, at the house. In the early evening, Swearinger and Durham went to a local store to shop for groceries, leaving Knight alone in the house. About 15 minutes later, appellant and Joan Swearinger entered without knocking.[3] Appellant pointed a gun at Knight, and told him that Robert Swearinger did not live in the house anymore. Appellant told Knight that he could leave "the hard way or the easy way." Knight chose the easy way and left.

Six days later, on June 6, Robert Swearinger and Cynthia Durham returned to the house between 1:30 and 2 a.m. after partying with friends. They soon went to bed, but Robert Swearinger was awakened by a crash which turned out to be the sound of the front door being kicked in. Moments later, Robert Swearinger saw appellant standing over him. Appellant fired three shots into the bed. The first hit Swearinger in the head near his left eye and the other struck Durham in her right hand.

Appellant was tried on the charges arising from the two incidents in August 1977. A mistrial was declared, however, when the trial court discovered that several jurors had seen prejudicial publicity about a murder at 1926 Quincy Street.

Joan Swearinger had taken over the Quincy Street house after the shooting of

---

**1.** Specifically, the indictment charged violations of D.C.Code 1973, § 22–1801(a), burglary while armed; § 22–1801(a), burglary; and § 22–502, assault with a dangerous weapon.

**2.** In relation to this incident, the indictment included violations of D.C.Code 1973, § 22–1801(a), burglary while armed; § 22–1801(a), burglary; § 22–501, assault with intent to kill while armed; § 22–501, assault with intent to kill; and § 22–502, assault with a dangerous weapon.

**3.** Joan Swearinger had inherited the Quincy Street house from her parents, and had quarrelled with Robert Swearinger over possession of the property.

Durham and Robert Swearinger. She leased it to Mamie R. Reeves for one year beginning July 1, 1976. In late June, 1977, Ms. Reeves informed Joan Swearinger that she and her family would be moving out on June 28, but that her son Timothy would be staying in the house until July 1. On June 28, appellant left his family's delicatessen, where he worked, carrying a pouch which usually contained a .357 magnum. Appellant explained that he had to "go over to the house and take care of some business." Appellant met Mr. and Mrs. Mabry at the house, who had inquired about renting it. A young man let appellant and the Mabrys into the house, and then went to the basement. The Mabrys later overheard a conversation between appellant and the young man in which the latter asserted his right to stay in the house until July 1 against appellant's statement that "[w]e're taking over the house." Appellant's co-worker, Robert Mitchell, also had heard him complain about the son of a tenant who would not leave so that the house could be cleaned up for a new occupant.

On June 29, Mamie Reeves returned to the Quincy Street house and found Timothy's body on the basement floor. He had been shot through the head and stabbed repeatedly. He still had money in his pockets and there were no signs of a struggle.

Appellant was indicted on a charge of first degree murder for the killing of Timothy Reeves on October 13, 1977. Since the assault charges stemming from the previous incidents had not yet been retried, the government filed a motion (which appellant opposed) to consolidate the charges contained in the two indictments for trial. The trial judge granted the motion to the extent of consolidating the charges against appellant, but he severed the charges against Joan Swearinger.

Appellant was tried before a jury and convicted on counts contained in both indictments. He filed a new trial motion which included a claim that the trial court erred in consolidating the charges in the two indictments. The motion was denied. Appellant was sentenced to prison for terms of 20 years to life for first-degree murder, to run consecutively to a 5 to 15 year term for one burglary conviction; for a 5 to 15 year term for the other burglary conviction, to run consecutively to the first; for concurrent 5 to 15 year terms for the two assaults with intent to kill while armed; for concurrent terms of 40 months to 10 years for assault with a dangerous weapon; and for one year for carrying a pistol without a license. This appeal followed.

II.

First, appellant contends that the trial court's interruptions of defense counsel and its comments on counsel's performance were so prejudicial as to deny him a fair trial. In evaluating this contention, we must examine the cumulative impact of the trial judge's participation to determine whether it could have prejudiced the jury's view of the defendant's case. See Khaalis v. United States, D.C.App., [408] A.2d [313] [357] (1979); Williams v. United States, D.C.App., 293 A.2d 484, 488 (1972); Jackson v. United States, 117 U.S.App.D.C. 325, 326, 329 F.2d 893, 894 (1964).

The trial court did interrupt defense counsel on a number of occasions to halt questioning that was irrelevant or without a sufficient basis (Tr. 269–70, 338, 375, 377–78), to warn against arguing with witnesses (Tr. 152–53, 155, 555), and to curtail repetitious questioning (Tr. 109–11, 252, 780, 937–40). On each of these occasions, intervention by the trial judge appears to have been justified. Although even valid interruptions may become prejudicial if they are made continuously, Young v. United States, 120 U.S.App.D.C. 312, 314, 346 F.2d 793, 795 (1965), such was not the case here. The interventions by the trial court were limited to keeping defense counsel's questioning within acceptable bounds.[4]

---

4. One particular incident, however, is worthy of an additional comment. (Tr. 437.) In his cross-examination of a police officer assigned to the Mobile Crime Laboratory, defense counsel asked whether the officer had determined whether Reeves' assailant was right- or left-handed. The trial court dismissed the witness because defense counsel was persisting in ask-

In its interruptions of counsel, however, the trial court occasionally did comment on his handling of the case.[5] Although it is unrealistic to expect a trial judge to maintain unlimited patience with counsel's errors, it must be remembered that "[i]n a jury case, a trial judge should exercise restraint and caution because of possible prejudicial consequences of the presider's intervention." *Jackson, supra* at 326, 329 F.2d at 894. The trial judge in this case, however, did not go so far in his comments as to suggest that defense counsel was incompetent or that Watson's case was insubstantial. Moreover, the comments usually were directed at the prosecutor as well as defense counsel. Finally, the comments cited in note 5 *supra* arose in the context of an eight-day trial in which 27 witnesses testified. In short, "[t]he trial was long and the incidents relied on ... few. We must guard against the magnification on appeal of instances which were of little importance in their setting." *Glasser v. United States*, 315 U.S. 60, 83 [62 S.Ct. 457, 471, 86 L.Ed. 680] (1942). Appellant's argument that he was prejudiced by the trial court's comments accordingly fails.

### III.

Appellant next argues that the trial court erred in consolidating for a single trial the indictment charging the two assaults and the indictment charging first degree murder. Under Super.Ct.Cr.R. 13, the trial judge "may order two or more indictments ... to be tried together if the offenses ... could have been joined in a single indictment." Offenses may be joined in a single indictment under Super.Ct.Cr.R. 8(a) if they "are of the same or similar character or are based on the same act or transaction or on two or more transactions connected togeth-

er or constituting parts of a common scheme or plan." Our inquiry, then, focuses on whether the assaults and the murder were sufficiently related to warrant a joint trial or whether, instead, the trial court abused its discretion in consolidating the indictments. *See Grant v. United States*, D.C.App., [402] A.2d [405], [407] (1979).

At the outset, we note that the indictment charging appellant with the first two (assault) offenses also charged a co-defendant, Joan Swearinger. Thus, in moving to consolidate these cases for trial with the third (murder) charge against appellant, the government presented the court with questions of joining co-defendants as well as joining separate offenses. Alert to these questions, the trial court stated at a pretrial hearing:

[A]fter reading everything and listening to argument the last time, there is no question in my mind that the cases should be severed—they must be severed. It can be resolved one of two ways. Let Mr. Watson be tried for both offenses individually, and Ms. Swearinger separately. Or try Ms. Swearinger and Mr. Watson for the murder case—I mean for the shooting. And then try Mr. Watson for the other [*i.e.*, murder] matter individually. What does the Government have to say?

MR. BENNER: Well, the Government's position is in view of the Court's ruling, we would move to consolidate all the charges against Mr. Watson, and sever the charge against Ms. Swearinger.

THE COURT: That seems to be the logical way to do it.

Appellant's counsel did not object; in fact, his memorandum in opposition to the government's motion to consolidate

---

ing questions which witnesses were not qualified to answer. Although termination of the defendant's cross-examination of a government witness may be an overly-harsh sanction for improper questioning, defense counsel did not object to the dismissal of the witness. The termination of questioning did not constitute plain error, *see Watts v. United States*, D.C.App., 362 A.2d 706 (1976) (en banc).

**5.** For example: "If you don't get something relevant, and I mean immediately, this witness will

be excused permanently. You lawyers are playing games in here now. I will not have that." (Tr. 372.) "The Government has been carrying this case on too far also. You all are going to conduct this case in a lawyer-like manner." (Tr. 377–78.) "I'm warning you.... One more interruption, one more multiple question, one more failing to let him complete an answer ... and cross-examination is terminated. I'm giving you this one last warning." (Tr. 939.)

stressed the improper joinder of appellant and Ms. Swearinger, not the joinder of the offenses charged against appellant. At no time during trial, moreover, did appellant's counsel seek a severance.[6] Not until after appellant's conviction did counsel, in a new trial motion, argue that the assault and murder charges should not have been joined in a single trial.

Under these circumstances, we conclude that we must apply the plain error standard of review. *See Watts v. United States*, D.C.App., 362 A.2d 706 (1976) (en banc). We agree with appellant that, on the facts here, consolidation of the murder charge with the two assault charges (which are properly joinable) cannot be justified by any of the five exceptions to the general bar against "other crimes" evidence set forth in *Drew v. United States*, 118 U.S. App.D.C. 11, 331 F.2d 85 (1964).[7] However, if "the evidence of each crime is simple and distinct," *Drew* also permits consolidation of two indictments for trial "even though [other crimes] evidence might not have been admissible in separate trials." *Id.* at 17, 331 F.2d at 91. We conclude that the argument is sufficiently strong for consolidation on this basis that the trial court did not commit plain error in failing, absent objection, to sever the murder and assault charges. *See Bell v. United States*, D.C. App., 332 A.2d 351 (1975) (defendant initiated joinder of offenses in single indictment and never objected); *Franklin v. United States*, 117 U.S.App.D.C. 331, 330 F.2d 205 (1964) (where defendants made no objection to joint trial, misjoinder was cured by the verdict).

## IV.

Appellant argues, finally, that the government's evidence was not sufficient to support his conviction for first-degree murder and, therefore, that the trial judge erred in denying his motion for a judgment of acquittal at the close of the government's case. He contends, more specifically, that the government failed to produce evidence of premeditation which would justify conviction of murder in the first degree.

Viewing the evidence, as we must, in a light most favorable to the government, *see Byrd v. United States*, D.C.App., 388 A.2d 1225, 1229 (1978), we find facts ample to permit a reasonable jury to find guilt beyond a reasonable doubt. *See Jackson v. United States*, D.C.App., 395 A.2d 99, 102 (1978). First, appellant had complained about Timothy Reeves' presence in the Quincy Street house. Prior to the killing, appellant told his co-worker, Robert Mitchell, that he "would kick the son's ass" if he did not leave the house. (Tr. 315.) Alvin Watson, appellant's brother, heard him tell Joan Swearinger that "we're going to get him out of that house." (Tr. 362.) Such threatening remarks, coupled with some passage of time, are probative of the speaker's deliberate and calculated intent to kill. *See United States v. Peterson*, 166 U.S.App.D.C. 75, 79, 509 F.2d 408, 412 (1974); *United States v. Mack*, 151 U.S. App.D.C. 162, 166, 466 F.2d 333, 337, *cert. denied*, 409 U.S. 952 [93 S.Ct. 297, 34 L.Ed. 2d 223] (1975 [1972] ).

Robert Mitchell also testified that appellant left the family store on the night of June 28 carrying the pouch for his .357 magnum. As he left, appellant stated that he intended "to go over to the house and take care of some business." (Tr. 321.) Although Mitchell did not actually see the gun that night, a reasonable juror could infer that appellant had carried a gun to the murder scene. The fact that a defendant carried a deadly weapon to the scene of

---

**6.** At oral argument counsel for appellant argued, apropos of his judicial misconduct allegation, *see* Part II *supra*, that trial counsel may have been too intimidated to seek a severance once it became clear that there were obstacles to defending three charges at one trial. We reject this contention.

**7.** The exceptions are:

(1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial. [*Drew, supra* at 16, 331 F.2d at 90 (footnote omitted).]

the crime is strong evidence of premeditation—of a calculated intent to kill.[8] *See Frendak v. United States,* D.C.App., [408] A.2d [364] [371] (1979); *O'Connor v. United States,* D.C.App., 399 A.2d 21, 26 (1979); *Peterson, supra* [166 U.S.App.D.C.] at 79, 509 F.2d at 412.

The testimony of Dr. Brownlee, the medical examiner, also supports the jury's conclusion that the homicide was planned. He testified that Reeves probably was asleep when he was attacked. (Tr. 488.) The stab wounds suggested that Reeves was lying on his back and there were no defensive wounds or other indications of a struggle. (Tr. 487.) The manner of killing can also provide a strong indication of whether the killer has premeditated the act. *See Byrd, supra* at 1230. The facts cited by Dr. Brownlee tend to indicate that the killer deliberately stabbed Timothy Reeves before Reeves had a chance to fight back.

Although the evidence supporting premeditation is circumstantial, the jury may infer premeditation from the surrounding facts and circumstances. *See Jackson, supra; Calhoun v. United States,* D.C.App., 369 A.2d 605 (1977); *United States v. Harris,* 140 U.S.App.D.C. 270, 435 F.2d 74 (1970) *cert. denied,* 402 U.S. 986 [91 S.Ct. 1675, 29 L.Ed.2d 152] (1971). The facts established here provide adequate support for the jury's conclusion.

Accordingly, it is

ORDERED AND ADJUDGED, that the judgment on appeal here be, and it is hereby, affirmed.

PER CURIAM.
FOR THE COURT:
/s/ Alexander L. Stevas
ALEXANDER L. STEVAS
Clerk

8. This is true even though the weapon carried to the scene may not be the same weapon that caused death. The testimony here indicated that Timothy Reeves was shot with a .25 caliber bullet.